# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**PHILIP R. SKODINSKI**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Apr 22 2013, 9:08 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DOUGLAS A. GUILMETTE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1205-CR-250 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No. 71D08-1012-MR-11

**April 22, 2013**

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

STATEMENT OF THE CASE

Douglas Guilmette appeals his conviction for murder. We affirm.

ISSUES

Guilmette raises three issues, which we reorder and restate as:

I.      Whether the trial court erred by admitting evidence.

II.     Whether the trial court abused its discretion by instructing the jury on accomplice liability.

III.    Whether the evidence is sufficient to sustain the conviction.

FACTS AND PROCEDURAL HISTORY

Guilmette and the victim, Greg Piechocki, worked for Kevin Rieder's moving company and sometimes stayed at Rieder's home on South Walnut Street in South Bend. Rieder kept several baseball bats in his home for protection.

Guilmette did not get along with Piechocki, who was like a "little brother" to Rieder. Tr. p. 227. Guilmette thought that Piechocki was "an a**hole" and that Rieder let Piechocki "get away with all kinds of sh*t." *Id.* at 660.

On the evening of September 13, 2010, Rieder and Piechocki arrived at Rieder's home and found Guilmette on the front porch. They all went inside and watched Monday Night Football. While they were all in the living room, Rieder paid Piechocki approximately $300 in cash for a couple of jobs. Around 12:30 a.m., Rieder took a sleeping pill, turned the fan in his bedroom on high, closed his door, and went to bed. Piechocki later went to bed in the spare bedroom.

At 5:25 a.m., surveillance videos showed Guilmette driving Piechocki's car into a Walmart parking lot. Guilmette went into the store, picked out a cell phone and some movies, concealed them in his clothing, and paid for a box of doughnuts with a large wad of cash. Just after 6 a.m., Guilmette went into the Meijer store just across the street from Walmart, picked out two liquor bottles, concealed them in his clothing, and paid for a box of doughnuts.

Later that morning, Rieder's neighbor Kyle Bowerman saw Guilmette driving Piechocki's car at about 7 a.m. Bowerman had backed his car out of his garage into an alley to take his wife to work, but stopped in the middle of the alley when the car started to whine. As he started to put some power steering fluid in, he heard a car approaching. From the sound of the motor, he could tell "it was coming pretty fast." *Id.* at 192. Bowerman looked up and saw Guilmette driving Piechocki's car. He put his hand up to say he was almost finished, but Guilmette "all of the sudden" backed out quickly, drove around the block, and parked on South Walnut across the street from Rieder's home. *Id.*

When Rieder woke up around 8 a.m., he noticed that a door to the home was open with the screen door propped open and that a blue tarp that usually covered a dirt pile in the backyard was missing. Rieder spoke with Guilmette on the phone about what he had observed, but Guilmette denied knowing anything about the door or the tarp.

Rieder tried calling Piechocki in the afternoon because they were scheduled to play in a pool league that night, but Piechocki did not answer. Later in the day, Rieder noticed that Piechocki's car was outside on the street and figured he might be in the home. He opened the door to the spare bedroom, turned on the light, and saw

3

Piechocki's body partly covered by a pink comforter. There was blood on the walls and blood pooled near Piechocki's head. Rieder called 911. The blood spatter evidence indicated that the spare bedroom door was open at the time of the murder. The blood spatter evidence also indicated that Piechocki was leaning up with his head level with the top of the headboard for some of the strikes and that he was lying down for other strikes.

Later that evening, on September 14, 2010, Detective David Wells picked up Guilmette at a Motel 6 and interviewed him at the St. Joseph County Metro Homicide Unit. Guilmette said Piechocki was a "fricking a\*\*hole" to him. *Id.* at 661. However, he denied any involvement in the murder and claimed he left Rieder's home in the morning on a bicycle with just six dollars to shoplift at Walmart and Meijer.

Detective Wells interviewed Guilmette at the Metro Homicide Unit a second time on September 16, 2010. Guilmette again stated he had ridden a bicycle to Walmart and Meijer on the morning of the crime, but when he was told surveillance videos showed him driving Piechocki's car, he admitted lying about the bicycle and said he had stolen Piechocki's keys from the bedroom after Piechocki had fallen asleep. He repeatedly denied taking Piechocki's money. However, when he was told surveillance videos showed him with a wad of cash, he admitted stealing Piechocki's money as well.

On September 16, 2010, at the conclusion of the second interview, Guilmette was arrested for the Walmart and Meijer thefts. Officer Thomas Cameron collected Guilmette's clothing and shoes, took them to an in-house lab area, and saw what he believed to be spots of blood on the shoes. Guilmette was given other clothes to wear and then transported to the jail, where he was given jail clothing.

4

Without a search warrant, Guilmette's shoes and several other items were transported to the Indiana State Police Lab on September 30, 2010, for blood and DNA analysis. A red stain on one of the shoelaces tested presumptively for blood. Because the stain was so small and a sample needed to be retained for DNA testing, no confirmatory test for blood was done. DNA testing of the stain gave a mixture from which Piechocki and Guilmette could not be excluded.

Later, multiple people came forward with information and testified at trial that Guilmette had confessed to the murder. Guilmette's cousin Cynthia Gyuriak contacted the police on October 14, 2010, and informed them that Guilmette told her he "couldn't stand [Piechocki]" and that he "wanted to f*ck [Piechocki] up." *Id.* at 350. In another conversation after the murder, Guilmette further told Gyuriak that he "beat [Piechocki's] head in with a f*cking baseball bat," and that he "Louisvilled him with a bat." *Id.* at 352. Guilmette also told her that he wrapped the bat in a tarp from Rieder's home and put it somewhere in the woods in Rum Village and that he stole movies and got doughnuts from Walmart and Meijer to be caught on camera for an alibi.

Kenneth Fox, Shawn Fox, and Edward Russell were each housed in the St. Joseph County Jail with Guilmette at different times pending trial. Guilmette told Kenneth that: (1) he had been living at a home with Rieder and Piechocki, (2) there were lots of bats in the home including one behind the couch, (3) Piechocki had been beaten with a bat while he was sleeping, (4) Piechocki was "missing like half his face," and there was blood everywhere in the room, *id.* at 390, (5) he might have gotten DNA on his shoes when he walked through the bedroom, and (6) he washed his clothes two or three times before he

5

gave them to the police to eliminate any DNA evidence. During one of their conversations, Kenneth said that if he had committed a murder, the body would never be found. Guilmette responded that "his problem is, is his body was found." *Id.* at 391. Guilmette also said that if he was found guilty, he would get a tattoo of a "little batman" holding a baseball bat in its feet. *Id.* at 385, 392.

Guilmette told Shawn that he and Piechocki got into a big fight one night. In the late hours of the night, Guilmette grabbed a bat from Rieder's room, went into Piechocki's room, stood over him, "snapped out," *id.* at 401, and started hitting him with the bat. He told Shawn he lost track of how many blows he dealt after twenty. After the murder, he showered, changed clothes, and drove to Walmart and Meijer to establish an alibi through video surveillance. He then went to a friend's house, and the friend put him up in a hotel. Guilmette further told Shawn that he had told his cousin what had happened and was worried she would turn him in, but that he would have his Aunt Judy say his cousin was lying, did drugs, and could not be believed.

Guilmette told Russell that he was at Rieder's home when he "beat [Piechocki] upside the head with a baseball bat." *Id.* at 458. Guilmette said "blood went everywhere" and explained that he "just kept beating him and beating him" to prevent Piechocki from getting up. *Id.* Guilmette took Piechocki's keys and $280 from his pocket, wrapped the bat and his clothes in a tarp, drove somewhere and dumped everything in a garbage bin, went to a Motel 6, and "got a[n] 8 ball of crack cocaine and a hooker." *Id.* at 466.

6

In November 2010, Guilmette learned from a jail inmate that Rieder was telling everyone that Guilmette had killed Piechocki. Hoping the police would focus more on Rieder, Guilmette asked for a third police interview in which he stated that Rieder was not asleep but awake the whole time and knew Guilmette took Piechocki's car. He explained that he initially lied about Rieder being asleep because "I didn't want [Rieder] to get in trouble, man. That's why I lied to . . . begin with, but see now it looks like [Rieder]'s trying to f*ck me." *Id.* at 706-07.

On December 21, 2010, the State charged Guilmette with murder, two counts of theft, and being an habitual offender. Guilmette filed a motion to suppress the DNA evidence found on his shoe, which the trial court denied after a hearing.

At a jury trial, Rieder, Bowerman, Wells, Cameron, Gyuriak, Kenneth Fox, Shawn Fox, Russell, and others testified for the State. Forensic pathologist Joseph Prahlow also testified, determining that Piechocki died of multiple blunt force trauma and that his injuries could be consistent with being struck with a baseball bat. Prahlow conservatively estimated Piechocki suffered ten separate blows to the head and face, with virtually every bone in his face fractured multiple times, and fifteen separate blows to the rest of the body. Defensive wounds, blood in his lungs, and blood and a tooth in his stomach indicated that Piechocki did not die from the first strike. Guilmette and others testified for the defense.

Although the State proceeded on the theory that Guilmette killed Piechocki, it tendered an instruction on accomplice liability, believing the jury might find that Rieder

killed Piechocki and Guilmette aided Rieder. The trial court gave the instruction over objection.

The jury found Guilmette guilty of murder and the thefts, and the trial court subsequently adjudicated him an habitual offender. The court sentenced him to sixty years for the murder, which was enhanced by thirty years due to the habitual offender finding, and two years for each theft, to be served concurrently to each other but consecutive to the murder, for an aggregate term of ninety-two years. Guilmette now appeals.

## DISCUSSION AND DECISION

## I. ADMISSION OF EVIDENCE

Guilmette contends that the trial court admitted the DNA evidence recovered from his shoe in violation of Article 1, Section 11 of the Indiana Constitution.[1] Specifically, he argues that the shoe, taken incident to his theft arrest, was unconstitutionally searched for evidence of the murder.

Article 1, Section 11 of the Indiana Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

Although the language of this provision tracks the Fourth Amendment almost verbatim, Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). The legality of

---

[1] Guilmette does not challenge the admission of the evidence on federal constitutional grounds.

8

a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Id.* Although there may be other relevant considerations under the circumstances, the reasonableness of a search or seizure under the Indiana Constitution generally turns on a balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion that the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs. *Id.* at 361.

At the time the police took Guilmette's shoe, they knew he was with Piechocki at the home the night of the murder, there was some level of animosity between them, and Guilmette lied about taking Piechocki's keys, money, and car until confronted with surveillance videos. The police thus had a high degree of suspicion that Guilmette might have been involved in the murder. In addition, any intrusion on Guilmette's ordinary activities when his shoes were taken incident to his theft arrest was slight, given that his shoes would have been taken shortly thereafter when he was booked into jail.

Nonetheless, the absence of any exigent law enforcement need tips the scale in Guilmette's favor. We take no issue with the police taking his shoe at the time of his arrest. Nor was it any violation for the police to look at his shoe and discover in plain view spots that appeared to be blood. At that point, it was altogether reasonable that the police, in the course of the murder investigation, would want to subject the shoe to blood and DNA analysis. However, as Guilmette was initially arrested for the unrelated crimes of theft and not murder, the police should have obtained a warrant to do so. After all,

9

Guilmette was already in custody, the police had the shoe in their possession, and there was thus little chance of contamination or destruction of evidence.

It is one thing to receive an inmate's clothing for inventory and safekeeping during his incarceration while awaiting trial for a crime. But using that opportunity to investigate and test the clothing regarding an unrelated and uncharged crime triggers the constitutional protection of needing to obtain a warrant to do so. We conclude that the laboratory testing of Guilmette's shoe, taken incident to his theft arrest, for evidence of the murder was an unconstitutional search under the Indiana Constitution. It was therefore error for the trial court to admit the DNA evidence.

However, when a trial court has erred in the admission of evidence, we will not reverse the conviction if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). The improper admission is harmless error if the conviction is supported by other substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* at 1059.

The DNA evidence from the shoe was not the strongest evidence of guilt. It merely consisted of testimony that a small stain on Guilmette's shoelace tested presumptively for blood and that subsequent DNA testing gave a mixture from which both Piechocki and Guilmette could not be excluded. Moreover, the testimony of four separate and independent witnesses that Guilmette admitted killing Piechocki with a baseball bat constituted overwhelming substantial independent evidence of guilt. Thus, the erroneous admission of the DNA evidence from the shoe was harmless.

10

## II. JURY INSTRUCTION

Guilmette also contends that the trial court abused its discretion by instructing the jury on accomplice liability. We review a trial court's decision to give a jury instruction for an abuse of discretion. *Treadway v. State*, 924 N.E.2d 621, 636 (Ind. 2010). We look to whether the challenged instruction correctly states the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the instruction is covered by other instructions. *Id.*

Guilmette argues only that there was no evidence in the record to support the accomplice liability instruction. We disagree. The evidence at trial showed that Rieder was in the home at the time of the murder and was the owner of several baseball bats. The evidence further showed that the door to the spare bedroom was open at the time Piechocki was brutally beaten to death and that Piechocki did not die immediately, perhaps contradicting the evidence that Rieder was asleep.

The jury also heard testimony that Guilmette requested a third police interview upon learning that Rieder was telling everyone that Guilmette killed Piechocki. He told the police in that interview that Rieder was awake the whole time and knew Guilmette took Piechocki's car. He further told the police that he initially lied about Rieder being asleep because he did not want to get Rieder in trouble, but he decided to tell the truth because "see now it looks like [Rieder]'s trying to f*ck me." Tr. p. 707.

Guilmette recanted his third interview statements at trial; that is, he testified that he lied about lying in his initial interviews. He claimed, "I d[id]n't even remember that [third] interview until I saw it yesterday. I have no idea what I was even talking about."

11

*Id.* at 705. Quite apart from this claim of ignorance, he later testified that he was hoping his lies in the third interview would get the police to investigate Rieder.

The jury could reasonably conclude from this evidence that Rieder committed the murder or was involved in it; that Guilmette had initially claimed Rieder was asleep to protect him; and, that Guilmette later said Rieder was awake the whole time and knew Guilmette took Piechocki's car when it appeared Rieder was selling him out. The trial court thus did not abuse its discretion by instructing the jury on accomplice liability. *See Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002) (no abuse of discretion in instructing on accomplice liability where instruction was at least marginally supported by evidence).

### III. SUFFICIENCY OF THE EVIDENCE

Guilmette finally contends that the evidence is insufficient to sustain his murder conviction. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Treadway*, 924 N.E.2d at 639. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

Guilmette acknowledges that his cousin Gyuriak and his fellow inmates Kenneth Fox, Shawn Fox, and Russell each testified that he confessed to the murder. Despite their testimony being clear and generally consistent, he challenges their credibility by pointing out their motives to lie and the inconsistencies between their accounts of the confessions.

The credibility of the witnesses or lack thereof was squarely presented to the jury and was a matter for their weight and evaluation. We will not second-guess those

determinations. The testimony from Gyuriak, Kenneth, Shawn, and Russell is more than ample evidence to sustain the murder conviction. *See Bell v. State*, 533 N.E.2d 1238, 1239 (Ind. 1989) (evidence sufficient where two jail inmates testified defendant admitted to crime).

## CONCLUSION

We therefore affirm Guilmette's conviction.

MATHIAS, J., concurs.

BARNES, J., concurs in result.