## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 13 2018, 10:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jamie L. Hancock, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 13, 2018 <br><br> Court of Appeals Case No. 18A-CR-180 <br><br> Appeal from the Elkhart Superior Court <br><br> The Honorable Teresa L. Cataldo, Judge <br><br> Trial Court Cause No. 20D03-1605-F2-10 |

**Brown, Judge.**

[1] Jamie L. Hancock appeals his convictions for robbery resulting in serious bodily injury, two counts of robbery resulting in bodily injury, criminal confinement resulting in serious bodily injury, and two counts of criminal confinement with bodily injury. Hancock raises two issues which we revise and restate as:

    I.    Whether the trial court abused its discretion when it denied his request for a continuance; and

    II.   Whether the trial court abused its discretion when it admitted certain evidence.

We affirm.

## Facts and Procedural History

[2] In the early morning hours of May 2, 2016, James Lee Johnson, Jr., left his electric wheelchair to answer a knock on the door to his home in Elkhart, Indiana. After Johnson opened the door, Amanda Wrye, the woman who knocked and whom Johnson recognized, told him that her car was malfunctioning down the street and that she needed help. Johnson permitted Wrye to enter his home and closed and locked the door behind her. As he returned to sit down in the wheelchair, she turned around and unlocked the door. After a very short period of time, a man and woman burst in the door. The man stated, "your money or your life," and when Johnson, who thought it was joke, started laughing, the man hit him across the face three to five times with an iron pipe which was "about 18, 20 inches long." Transcript Volume 3 at 12, 14. As the man struck Johnson, the two women watched and stood back. The man began "pullin' . . . and dumping drawers" and, ultimately, the man and two women took a skill saw, a jar of pennies from the dresser in Johnson's

bedroom containing "seventy-some dollars," and Johnson's wallet containing various credit and debit cards, including one from PNC Bank.[1] *Id.* at 18-19. At some point, the assailants ripped wires from Johnson's wheelchair and used them to tie him to it. As a result of the attack, Johnson's dentures and nose were broken and his forehead was gashed.

[3] At about 4:00 a.m. that same morning, Juanita Tripp received a knock on the sliding door in the back of her Elkhart home from two females standing on the porch who she did not recognize. At the time, Juanita's husband, William Tripp, was asleep in the bedroom in the rear part of the house. Juanita asked the two females what they wanted, they responded that they needed to use the phone because they had "just got [back] from the hospital and . . . need[ed] to get a way home," and she let them into the house, thinking "nothin' about it." Transcript Volume 2 at 177. As the two of them went to use the bathroom, Hancock walked into the house "[a]ll of a sudden" and, when the pair returned, asked to use the restroom. William identified one of the females as Jonie McMahan and testified that she pushed Juanita against the refrigerator and tased her about "three different times." *Id.* at 178.

---

[1] At trial, State's Exhibit No. 25, a picture of a PNC Bank Visa card with the name "James L Johnson Jr" printed on it was admitted and Detective Michael Carich testified that, during a May 5, 2016 interview, Hancock had stated he rented a room at the Garden Inn, that he had gained access to the room, and that he had discovered a small trash can between the beds which contained a "PNC Visa bank card with the name of James L. Johnson, Jr." Transcript Volume 3 at 81.

[4] Hearing Juanita from the bedroom, William began to investigate and started down the hall when he heard her scream. *Id.* at 108. Hancock, who "had . . . like a big huntin' knife," intercepted him and threatened to kill him if he said anything. *Id.* Hancock tackled William, hit him on the face, and asked William for money and if he had a gun. During this time, one of the females began removing jewelry from Juanita. At some point, Hancock accompanied William to the back bedroom, and William gave him "about eleven hundred dollars." *Id.* at 117. When they returned, Hancock "said somethin' about 'put 'em in the closet,'" asked William for a rope, and Hancock and the two females told William and Juanita to "get in the closet" of the bedroom. *Id.* at 118, 120. Hancock tied their hands with a rope he had found in the closet and tied the closet door to the hallway door. The Tripps were confined in the closet for approximately thirty minutes before they exited and, when they did, Hancock and the two females had left the residence and the cords to the telephones had been cut. As a result of the attack, William was admitted to the emergency room with a collapsed lung and stayed at the hospital for four and one-half days.

[5] On May 5, 2016, Hancock was interviewed by the police, during which he stated:

> I parked down the road . . . the blonde went up to the door, she goes inside, me and the other girl walk up to the porch, the other girl pushes the door open and goes in, I stand in the doorway.

State's Exhibit No. 32 at 2:57:55-2:58:10. Hancock maintained that one of the females "hit the guy" on the head with a pipe more than once. *Id.* at 2:58:18-2:58:20. He stated that he stood in the doorway "to make sure no one else interfered" and answered affirmatively when subsequently asked if he meant "like coming in from the outside, like a lookout?" *Id.* at 3:02:07-3:02:15. He maintained that they were at Johnson's house for "maybe three minutes," returned to the truck and one of the females "carried out" the skill saw, and drove first to a gas station where the female threw the pipe away and then to a church parking lot. *Id.* at 3:02:20-3:02:30. He stated that he watched the girls cross the street and enter a house, that he did not "go into that house," but instead "went to the back door and then . . . left" because one of the females had a taser, and that he was at the sliding glass door on the porch looking inside the house when he saw the female with the taser "hitting someone in the neck." *Id.* at 3:03:57-3:04:03, 3:06:30-3:06:36. He correctly identified by picture Wrye or McMahan as one of the females he was with.

[6] On May 10, 2016, the State charged Hancock with robbery resulting in serious bodily injury as a level 2 felony, robbery resulting in bodily injury as a level 3 felony, criminal confinement resulting in serious bodily injury as a level 3 felony, and criminal confinement resulting in bodily injury as a level 5 felony. Later, the State added charges for robbery resulting in bodily injury as a level 3 felony and for criminal confinement resulting in bodily injury as a level 5 felony.

[7] On May 12, 2016, the public defender's office was appointed to represent Hancock. A chronological case summary ("CCS") entry, which indicates that a hearing was held on July 7, 2016, states:

> [Hancock] appears and indicates he wants to discharge his counsel. [Hancock] files waiver of attorney and demand to proceed *pro se*. A record is made with respect to [Hancock] wishing to represent himself. Against the Court's advice, [Hancock] decides to represent himself. [Hancock] requests Court approve the order to accept waiver of attorney and the order approving demand to proceed *pro se*. Orders entered.[2]

Appellant's Appendix Volume 2 at 7.

[8] On May 10, 2017, Attorney Luke Krizek filed his appearance on Hancock's behalf. A CCS entry notes that a hearing was held on May 25, 2017, that Attorney Krizek had previously filed a motion to continue, and that the jury trial, set for June 5, 2017, was rescheduled for July 10, 2017. Another CCS entry indicates that, on June 29, 2017, the court held a hearing and that Attorney Krizek had not completed discovery, that the State objected to a previously filed motion to continue, and that the court *sua sponte*, and over the State's objection, rescheduled the jury trial to September 18, 2017. An August 31, 2017 CCS entry states in part: "August 31, 2017 cause came on for Pre Trial

---

[2] The record includes the waiver of attorney and demand to proceed *pro se* signed by Hancock, the accompanying order to accept waiver of attorney, and an "Order Approving/Disapproving Demand to Proceed Pro Se," all dated July 7, 2016. Appellant's Appendix Volume 2 at 219. In the demand to proceed *pro se*, Hancock indicated "only I can get the Evidence to prove my innocenses [sic]" below the prompt which asked him to explain why he was competent and able to properly and adequately defend himself. *Id.* at 220.

Conference. . . . [Attorney Krizek] states defense is ready to go to trial. [Hancock] requested to proceed pro-se. Arguments heard. [Hancock] filed DEMAND TO PROCEED AS A SELF REPRESENTED LITIGANT." *Id.* at 15.

[9] On September 18, 2017, the jury trial began and Hancock proceeded *pro se* with Attorney Krizek acting as stand-by counsel. Addressing Hancock, the court stated in part:

> [Y]ou have indicated that you want to represent yourself at . . . trial. [] I want you to understand, though, what you are giving up. [] You may have a number of defenses which apply to your case and which an attorney is trained to know. [S]hould you be convicted of the offenses, you are facing a total . . . possible penalty, on the high side of 90 years; on the low side 21 years and there are factors which the court can consider in increasing your sentence within the range or in decreasing your sentence . . . . These factors which an attorney would know about.

Transcript Volume 2 at 3-4. The court inquired in part into Hancock's education, skills, and knowledge and stated: "[W]e're here at trial today, sir, and I've already told you that this was a bad decision, and I informed you that I was not going to grant a continuance at the last hearing." *Id.* at 6. The following exchange occurred between the court and Hancock:

> [Hancock]: The last time I was in court with you, ma'am, you said you'd give me one opportunity to take my attorney back.
>
> The court: Correct.

[Hancock]: I've been trying to get a hold of [Attorney Krizek]; he will not answer me.

The court: He was not appointed. So . . . I guess my question to you is, do you want your attorney back? [B]efore you answer, I will tell you, I will give you one opportunity to get your attorney back. If he is in for the trial, he is in for the remainder of the trial. I – we're not going to do this thing where he's in, he's out; he's either in or he's out. And I will advise you that [Attorney Krizek] is well aware of the procedure of the court and he realizes if he's in now, he's in. He's not going to get a continuance because there was this two-week hiatus that he was not on the case. He realizes that he's in.

*Id.* at 7. After Hancock spoke with Attorney Krizek, he again confirmed he would proceed *pro se*. When asked to respond to the State's statement that it had "went out to the jail on Wednesday of last week . . . to go through discovery with [Hancock] even though it was [the State's] understanding that he had seen discovery with his two prior public defenders," Hancock admitted that the State had come out to the jail and stated that he had asked for all written and oral video and audio statements by all victims and co-defendants and received only "video – CDs and [William's] medical records." *Id.* at 12. Counsel for the State replied that written interviews and statements from the victims did not exist and that it was his understanding that Hancock wanted only William's medical records but that he could give him the remainder. After more dialogue, the court granted Attorney Krizek's request for a ten-minute break to speak with Hancock and Hancock proceeded *pro se* throughout the remainder of the first day and the State's first witness.

[10] At the beginning of the second day of trial, the court addressed Hancock and stated:

> [T]he only assistance that [Attorney Krizek] is going to assist you in as – in his position as stand-by counsel – because it is your responsibility as the lead attorney on this case to make sure that you have your exhibits prepared and you have everything in order for this trial. Again, when we started this trial, . . . you indicated to me that you were ready to go and ready to proceed. Therefore, any licensed practicing attorney for the state of Indiana realizes that that means that you have all your exhibits ready to go, that you are ready to trial [sic], not that you still have to figure out how to print them out, not that you have issues with any of the things that you were trying to accomplish during the trial. So, I will ask you one more time, are you still – are you still planning on proceeding *pro se*?

*Id.* at 95-96. Hancock agreed, and the court warned that it wanted all objections timely, instructed Hancock that he would be arguing those objections, and indicated that, if the State were to respond and he did not know how to reply, then it was his "responsibility because you are lead counsel." *Id.* at 96. Hancock acknowledged that he understood.

[11] The State presented William as its second witness, and William identified Hancock in the courtroom as the man who threatened him with a knife. After the State's examination of William, Hancock asked to reserve the right to call him at a later date, the court responded "that is dependent on whether or not you have an outstanding subpoena" on William, and Hancock stated he had not issued a subpoena. *Id.* at 152. Hancock explained he had asked the jail in writing and e-mails for the subpoena forms, that they had told him that it was

his responsibility "to get these forms . . . even though I do not have access to them," and that he did not know that the subpoenas were not issued until yesterday. *Id.* at 152-153. The court stated that there were no motions that morning, that Hancock was held to the standard of a licensed practicing attorney, and that he could ask then whatever questions he had of William, "but this is the only time he's going to be on the stand unless the State recalls him under their subpoena."[3] *Id.* at 154.

[12] After the court released William, Hancock asked if he could "still have [Attorney Krizek] represent" him as his full attorney and the court agreed to reappoint Attorney Krizek after questioning Hancock. *Id.* at 156. Attorney Krizek moved for a mistrial which the court denied.

[13] Detective Michael Carich testified that he met with William on May 3, 2016, showed him a photo array containing Hancock, which the court admitted as State's Exhibit No. 26, and that William "immediately pointed to [Hancock] on the bottom row and the far right . . . and identified [him] as . . . the male robber that was in his house that attacked him." Transcript Volume 3 at 89. After the State played State's Exhibit No. 32, an audio recording of Hancock's May 5, 2016 interview, Detective Carich testified that Hancock referred to McMahan and Wrye in the interview and that both McMahan and Wrye had pled guilty and been sentenced "for the three robberies." *Id.* at 116. The State then moved

---

[3] William was recalled as a witness by Hancock on the third day of the trial, September 20, 2017.

to admit redacted and nonredacted judgments of conviction for McMahan and Wrye, as well as charging information for the pair which alleged that McMahan, Wrye, and Hancock committed the charged crimes together. Attorney Krizek objected to the documents' admission due to its prejudicial nature and "how it's relevant to [Hancock] committing the crimes." *Id.* at 117. After admitting the exhibits, the court noted that "there was no objection at the time . . . the witness stated that – what happened to the other co-conspirators." *Id.* at 119.

[14] On the third day of trial, after the State had called all of its witnesses, Attorney Krizek requested a continuance, alleged that "there's an overwhelming line of information and I'm just not gonna be able to present to the jury because I was appointed during the trial and did not have the ability to send out subpoenas," and identified Officer Darci Campbell, Detective Cam McDowell, and a confidential informant as the witnesses that he would like to call.[4] *Id.* at 144. After the court asked what information he hoped to glean from the potential witnesses, Attorney Krizek indicated that Officer Campbell "took a statement from the [confidential informant] indicating that [McMahan] had . . . stated that she was the one who beat [Johnson], which links up the – the confession that [Hancock] said he never went in," that "it also is a direct impeachment of .

---

[4] The record reveals that only Officer Darci Campbell appears on either the State's or Hancock's List of Witnesses and Exhibits, filed on June 7, 2017, and August 21, 2017, respectively. The record also reveals that the May 10, 2016 Affidavit to Establish Probable Cause included in the October 5, 2017 Memorandum from a Probation Officer was signed by a "Det[.] Cam McDowell." Appellant's Appendix Volume 3 at 157.

. . the testimony of [Johnson]," and that he had a "laundry list of things" for Detective McDowell and the confidential informant. *Id.* at 146. The court denied the continuance, stating that Hancock "knew of the consequences of his decision back when he made it," "[h]ad counsel stayed on, counsel would have followed through [with] the requirements," and that it did not find that Hancock was prejudiced "because it was [his] own actions that caused this situation to arise." *Id.* at 151-152.

[15] The jury ultimately found Hancock guilty on all counts. On December 7, 2017, the court held a sentencing hearing at which it sentenced Hancock to an aggregate term of sixty-two years.

## *Discussion*

## I.

[16] The first issue is whether the trial court abused its discretion when it denied Hancock's request for a continuance. Rulings on non-statutory motions for continuance are within the trial court's discretion and will be reversed only for an abuse of that discretion and resultant prejudice. *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018) (citing *Maxey v. State*, 730 N.E.2d 158, 160 (Ind. 2000)). An abuse occurs only where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* (citing *Palmer v. State*, 704 N.E.2d 124, 127 (Ind. 1999)). "There is a strong presumption that the trial court properly exercised its discretion." *Id.* (quoting *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002)). We will not conclude that the trial court abused its discretion

unless the defendant can demonstrate prejudice as a result of the trial court's denial of the motion for continuance. *Stafford v. State*, 890 N.E.2d 744, 750 (Ind. Ct. App. 2008) (citing *Dorton v. State*, 419 N.E.2d 1289, 1295 (Ind. 1981)). Continuances to allow more time for preparation are not favored and are granted only by showing good cause and in the furtherance of justice. *Id.* (citing *Timm v. State*, 644 N.E.2d 1235, 1237 (Ind. 1994)).

[17] Hancock argues that his right to a fair trial was prejudiced when the trial court denied his continuance, thus preventing him from presenting additional witnesses and adequately presenting his defense. He asserts that, to be effective, counsel must be given sufficient opportunity to adequately prepare his case, points to the fact that he opted to proceed *pro se* on August 31, 2017, and maintains that Attorney Krizek remained as stand-by counsel at trial in which "his only obligation at trial was to be present to answer legal questions" and that "[a]s a result, subpoenas were not issued." Appellant's Brief at 10. Hancock contends that Attorney Krizek was "forced into a position" where a continuance was warranted in order for him to "secure witnesses that were critical" to Hancock's defense. *Id.* at 11. He also contends that he had attempted to obtain the subpoena forms from the jail but was denied the opportunity to do so. The State argues Attorney Krizek was appointed to represent Hancock several months before trial and was aware of potential witnesses before the trial began, that the court warned Hancock that it would not grant another continuance for preparation purposes when he decided to

proceed *pro se*, and that he cannot claim prejudice for his own decision when he was aware of the pitfalls of proceeding *pro se*.

[18]     The record reveals that Hancock decided to represent himself against the court's advice on July 7, 2016. Attorney Krizek filed his appearance on Hancock's behalf on May 20, 2017, and stated to the court that the defense was ready to go to trial on August 31, 2017, the date when Hancock filed his demand to proceed *pro se*. It also reveals that when the jury trial began on September 18, 2017, the court spoke to Hancock about self-representation and the potential numerous defenses "which an attorney is trained to know," stated that proceeding *pro se* was a "bad decision" and that it had informed him at the last hearing that it was "not going to grant a continuance," and, upon his statement that he had been trying to contact Attorney Krizek, asked if he wished to have representation. Transcript Volume 2 at 3-4, 6-7. We note that the court advised Hancock that Attorney Krizek was "well aware of the procedure of the court and he realizes if he's in now, he's in" and he was "not going to get a continuance because there was this two-week hiatus that he was not on the case" and that Hancock spoke with Attorney Krizek before he again confirmed his desire to proceed *pro se* until after the State's first two witnesses when he asked to have representation. *Id.* at 7. We cannot say, based upon the record, and under these circumstances, that Hancock demonstrated prejudice or that the trial court abused its discretion

in denying Hancock's motion for a continuance.[5] *See Harbert v. State*, 51 N.E.3d 267, 280 (Ind. Ct. App. 2016) (declining to find that the trial court abused its discretion in denying the defendant's motion to continue the trial and noting that, for months, he had delayed, despite the court's caution that trial would proceed as scheduled and its statement that an attorney would be appointed if he could not afford to hire one), *trans. denied*.

## II.

[19] The second issue is whether the trial court abused its discretion by admitting certain evidence relating to Wrye and McMahan's convictions. Hancock argues that the admission of Hancock's co-defendants' "judgment of convictions, paired with testimony that they had pled guilty to the robberies in question" was unduly prejudicial and used by the State to establish Hancock's guilt as it related to these robberies. Appellant's Brief at 9. The State argues that evidence of a co-defendant's acts has been held admissible when the act is directly related to a defendant's crime and points out that Detective Carich testified, without objection, that both Wrye and McMahan had pled guilty and been sentenced for the robberies. The State points out that Hancock acknowledged that he was with Wrye and McMahan that night, thereby placing "his identity at issue." *Id.* at 19. The State also argues admission of the

---

[5] To the extent Hancock argues that the jail was obligated to provide blank subpoenas, we note that he does not cite authority and did not provide evidence, other than his own statement, of any written request or the jail's alleged response.

evidence was merely cumulative of information that was admitted without objection and that there is substantial independent evidence to support Hancock's convictions.

[20] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). The Indiana Supreme Court has explained:

> Generally, a trial court's ruling on the admission of evidence is accorded a great deal of deference on appeal. Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and only reverse if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015) (citations and quotation marks omitted), *reh'g denied*. We do not reweigh the evidence; rather, "we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant." *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016) (quoting *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015)). However, we will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[21] The record reveals that William identified Hancock during trial as the man who threatened him with a knife and Juanita testified that Jonie tased her approximately three times. Johnson testified that he recognized Wrye and that the man whom she was with hit him across the face three to five times with an iron pipe which was "about 18, 20 inches long." Transcript Volume 3 at 14. During the May 5, 2016 interview, Hancock correctly identified by picture Wrye or McMahan as one of the females he was with the night of May 2, 2016. According to Hancock's own statements, he was at Johnson's house for "maybe three minutes" and, while Johnson was hit on the head with a pipe more than once, he served at the very least as a "lookout" at the doorway to "make sure no one else interfered." State's Exhibit No. 32 at 3:02:07-3:02:15. Also according to his testimony, he stood at the sliding glass door on the porch of the second house while one of the females with the taser attacked an occupant of the house. Detective Carich testified that William, when shown a photo array, immediately identified Hancock as the male robber that was in his house and attacked him. We note that Detective Carich testified that Hancock referred to McMahan and Wrye in the May 5, 2016 interview and that both McMahan and Wrye had pled guilty and been sentenced "for the three robberies," and also observe that no objection was forthcoming until after the State moved to admit judgments of conviction, charging information, and redacted judgments of conviction for McMahan and Wrye. Transcript Volume 3 at 116. We conclude that any alleged error in the admission of evidence relating to Wrye and McMahan's convictions was harmless in light of the other substantial independent evidence of Hancock's guilt.

## *Conclusion*

[22]    For the foregoing reasons, we affirm Hancock's convictions.

[23]    Affirmed.

Altice, J., and Tavitas, J., concur.