## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 15 2020, 8:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kay A. Beehler
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael A. Huff, *Appellant-Defendant*, | April 15, 2020 |
| | Court of Appeals Case No. 19A-CR-2028 |
| v. | Appeal from the Pulaski Superior Court |
| State of Indiana, *Appellee-Plaintiff*. | The Honorable Crystal A. Kocher, Judge |
| | Trial Court Cause No. 66D01-1901-F5-1 |

**Brown, Judge.**

[1] Michael A. Huff appeals his conviction for possessing material capable of causing bodily injury by an inmate as a level 5 felony and claims the trial court abused its discretion in admitting evidence and the evidence is insufficient to sustain his conviction. We affirm.

## Facts and Procedural History

[2] In January 2019, Huff was an inmate in the Pulaski County Jail. On January 14 or 15, 2019, Pulaski County Sheriff's Sergeant of Corrections Christopher McAninch conducted a C.A.B. hearing, which is "basically just a committee hearing board for disciplinary," with Huff in a cell for attorney visitation. Transcript Volume II at 141. Sergeant McAninch wore a body camera during the hearing in order to record Huff's "testimony and everything else for [the] C.A.B. hearing." *Id.* at 144.

[3] After concluding the hearing, Sergeant McAninch called the pod control officer to unlock the door. The locking mechanism for the door slid open, and Huff proceeded to open the door quickly and then closed the door quickly in front of Sergeant McAninch, locking him inside the visitation room.

[4] Huff moved down the hallway past the dispatch center. Sergeant McAninch tried to radio to unlock the door and observed an officer hurry to the control panel to unlock the door. He walked out of the room and yelled Huff's name. Huff stopped, hesitated for a second, and then started walking towards him. Sergeant McAninch placed Huff into a holding cell, and Huff kicked the door

after being placed inside. Huff "started to attempt to tear his mat apart" and "stuff things in the toilet." *Id.* at 148.

[5] Sergeant McAninch went to Huff's old cell and noticed his sleeping mat was "very heavy." *Id.* at 149. After a metal detector alerted on the mat, Sergeant McAninch noticed the mat was hand sewn with white string material, cut open the mat, and discovered what looked like the blackened end of a paperclip. The officers decided to use a metal detector on the remainder of Huff's belongings. Sergeant McAninch discovered an envelope that was "sealed pretty tight" with the name Braden Huff on it and felt a stiff object in the envelope that would not bend as easily as paper. *Id.* at 152. He opened the envelope and discovered handwritten letters dated November 2018 from a female inmate located in the facility, a piece of toilet paper, and a razor blade. Sergeant McAninch completed a contraband confiscation form and reviewed the form with Huff.

[6] On January 17, 2019, the State charged Huff with possessing material capable of causing bodily injury by an inmate as a level 5 felony. Huff waived his right to counsel. At the jury trial, when asked how he was acquainted with Huff, Sergeant McAninch answered without objection: "[T]hrough several incidences inside the jail . . . . From when I first started here, um, several incidences in which I was personally involved in, um, through physical incidences with him, um, dealing with his C.A.B. hearings from other staff in which he has had disciplinary problems with." *Id.* at 140. Sergeant McAninch also testified without objection: "At the time, he was actually serving a disciplinary sanction in our disciplinary block." *Id.* at 143.

[7]     During Sergeant McAninch's testimony, the prosecutor asked to display the first video from the bodycam. Huff objected and asserted the video was not relevant to the facts of the charge. The court overruled the objection, found that "it is relevant based on the fact that it is foundation for the offense that occurred," and marked the disc containing the bodycam footage as State's Exhibit 1. *Id.* at 146. The first video consisted of a seventy-three second clip showing the end of the C.A.B. hearing in which Huff exited the room, closed the door, walked away from Sergeant McAninch, and stated he was going back to the block in a reasonable manner. The video includes an abrupt sound after Huff was placed in a holding cell and a statement by Sergeant McAninch telling him to quit hitting the door.

[8]     The prosecutor later asked to publish the second video showing the search of the envelope. When the court asked Huff if he had any objection to the publication of the second video, Huff answered in the negative. The court published the second video on State's Exhibit 1 to the jury. This 125-second video showed the wanding of the envelope by a metal detector and Sergeant McAninch feeling and opening the envelope.

[9]     Sergeant McAninch testified that possessing razors constitutes a "very high security risk, as well as a safety concern for both inmates and staff." *Id.* at 157. When asked the reason, he answered:

> There is [sic] multiple concerns when it comes into it, whether it be dangerous because it could be easily affixed to a handle, whether you take a toothbrush, get it hot enough to where the

plastic becomes moldy, it can be affixed in there. It can be attached to pencils, and the blade is, now has a longer handle on it. It could be used more as a slashing tool, um, as well as some inmates could potentially use it for a suicide attempt.

*Id.* at 158.

[10] Without objection, the court admitted a third video on State's Exhibit 1 containing the video of the review of the contraband confiscation form. In the five-minute video, Sergeant McAninch reviewed the form with Huff and indicated he found a paperclip in the sleeping mat and a razor blade in an envelope. Huff asked about his pillow, and Sergeant McAninch indicated it was destroyed because it was handsewn on the top and was alerting on the metal detector and stated, "I already found a paperclip in the mat and then I'm finding razorblades in the other stuff." State's Exhibit 1. Huff stated: "There shouldn't have been no razorblades in no other stuff." *Id.* Huff also stated that the envelope had been sealed for months. The video revealed Huff stating there was no reason to take the mail and the envelope and Sergeant McAninch stating it was all seized for evidence and this was going to be an ongoing investigation.

[11] On cross-examination, Huff asked if there had ever been a report of him intimidating someone with a razor blade, and Sergeant McAninch answered that he believed so and stated "there was a jury trial with intimidation in which it was actually mentioned to the jail commander about causing harm to him of cutting something up." Transcript Volume II at 167. When later asked by Huff

if he had ever intimidated somebody with a razor blade threatening to cut them or harm them, Sergeant McAninch answered: "Not with a razorblade, but finding them in the cell, and the intimidation of harming staff or anything like that, it's, it's not going to be a, a bridge that I want to cross." *Id.* at 168.

[12] On redirect examination, the following exchange occurred without objection:

> Q  You said that uh, you were asked about whether or not, in addition to the intimidation question, that was asked repeatedly, there was, was [Huff] ever found with a razorblade, and you started to answer that in the affirmative.  What were you talking about?
>
> A  As far as being found with a razorblade?
>
> Q  Uh huh.
>
> A  Multiple times.

*Id.* at 170.  On recross examination by Huff, the following exchange occurred:

> Q  So you said the Defendant has been found multiple times in possession of a razorblade, and you have never heard of him threatening anyone or using it to harm anyone with it?
>
> A  No.
>
> Q  On these multiple times he has been found in possession of a razorblade,
>
> A  Yes.
>
> Q  Yeah, none of these times there has ever been any reports of him harming anyone with a razorblade or threatening anyone with a razorblade?

A    Because the officers would discover them in time.

*Id.* at 170-171.

[13]    Without objection, Pulaski County Sheriff's Corrections Officer Isaiah Hilt testified Huff kicked the door after being placed inside the holding cell. The court also admitted photos of the razor blade found in the envelope.

[14]    Corey Scott McKinney, the investigations supervisor assigned to the Westville Correctional Facility, testified that he received specialized training concerning inmates and the potential use of weapons and developed an expertise in the area of weapons used by inmates. He testified that inmates use a razor blade for anything from "a tool for like arts and crafts, things to send out to their families, to cutting tools for, for weapons." *Id.* at 205. When asked how inmates modify a disposable razor so it can be used as a weapon, McKinney answered that "the razors that our facility use have a plastic safety shroud around them that is not meant to be disassembled, so it has to physically by, the plastic has to physically be broken off in order to gain access to the metal strip of razor inside of it" and that "[t]hey are referred to commonly as like a safety razor." *Id.*

[15]    He indicated the blades are dangers to others for "any number of reasons" including by coming into contact with staff during the search of an offender's property. *Id.* at 206. He stated that the Department of Correction has restrictions on the use of razors because they can be used as a dangerous instrumentality and are classified as dangerous weapons. He testified that a

great number of cases he had investigated or supervised involved razor blades and that injuries involved slicing injuries, cutting major veins and arteries, serious injury to the limbs, permanent disfigurement, or death. When asked to review the photos of the razor blade found in this case and whether it could cause bodily injury, he answered, "Yes. Absolutely." *Id.* at 212. He testified he had seen cases where "they are used as they are in that, in that photo, where no extra preparation has been done, other than removing it from the plastic shroud." *Id.* at 213. The following exchange then occurred:

> Q So, the mere fact of having a razor or part of a razor as depicted in those photos, would be classified by the Department of Corrections as a dangerous instrumentality. Is that correct?
>
> A As soon as it is modified from its intended purpose, which is a shaving razor for the Department of Correction. As soon as it is modified in its, and it's placed in a manner like what the photos are there, they are dangerous weapons, yes.

*Id.* He also indicated he did not conduct any portion of the investigation in this particular case and was present in court only in capacity as an expert witness on razor weapons in prisons.

[16] After the State rested, Huff testified that he was a little upset with the outcome of the C.A.B. hearing and walked out "letting the door shut behind me out of spite, because I was upset." *Id.* at 222. He testified that Sergeant McAninch placed him in a holding cell and gave him new property to hold him over until his property was searched. He stated the officers brought him out sometime later to read him a confiscation sheet and advised him they found a razor in an

envelope addressed to his father, Brandon Huff. He testified he did not remember ever putting a razor in the envelope. He stated that, while the letters were dated from November, he could not send the envelope to his father until he received the address of his father's new house. He stated it was common for inmates to have razor blades and that they are used for cutting hair and pictures, arts and crafts, and sharpening pencils.

[17] On cross-examination, Huff acknowledged he had multiple convictions of theft. He also indicated that he let the door slam to lock Sergeant McAninch in the room. He testified that a broken razor from a shaving kit could be used to cut pictures and sharpen pencils, and when asked if razor blades are passed out for those purposes, he answered in the negative. He also indicated that he pops razors open to remove the blades. The jury found Huff guilty as charged, and the court sentenced him to sixty months incarceration.

## *Discussion*

### I.

[18] The first issue is whether the trial court abused its discretion by admitting certain evidence. Huff challenges the admission of the video evidence as well as the testimony of Sergeant McAninch and McKinney. He mentions Ind. Evidence Rules 401, 402, 403, and 404, and argues that "[m]uch of the evidence presented at the trial in this matter was not relevant and therefore not admissible." Appellant's Brief at 7. He asserts that State's Exhibit 1 was prejudicial to his right to a fair trial because the video clip in which Sergeant

McAninch reviewed the confiscation form contained allegations regarding other jail infractions and refers to an "ongoing investigation." *Id.* at 9. He contends the first video clip played for the jury referred to a disciplinary hearing and a sentence of "30 days" after which the officer accused Huff of "not going back to [his cellblock] in a reasonable manner." *Id.* He argues the segment involving the search of the envelope may arguably be relevant, but its probable effect on the jury pales in comparison to the rest of the video evidence.[1] *Id.* He also points to the testimony of Sergeant McAninch that he "kicked the door" of a holding cell and testimony regarding uncharged allegations that he had been in possession of razor blades on other occasions. *Id.* at 10 (quoting Transcript Volume II at 175). He asserts that he objected to the admission of the video evidence on the proper grounds that it was irrelevant, prejudicial, and confusing and that his failure to object to specific additional testimony was not fatal to his claim because it constituted fundamental error.

[19] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the

---

[1] Huff contends State's Exhibit 1 contains five separate segments, four of which are irrelevant. He also asserts without citation to the transcript that "[t]he segments [of State's Exhibit 1] titled 'Altered Mattress' and 'Mat With Paperclip' depicts [sic] officers discussing a mattress containing 'other stuff' and the alert of a metal detector on what officers identified as a piece of paperclip embedded in the interior padding of a mattress." Appellant's Brief at 9. As pointed out by the State, State's Exhibit 1 is a DVD containing five video clips. The State asserts the titles were not relayed to the jury, the DVD was not sent to the jury during its deliberations, and the three clips played for the jury included the clips titled "Huff door slam and kick," "metal detector and discovery of razor," and "Huff statement about razor." Appellee's Brief at 10 n.4. Based upon the transcript, it does not appear that the clips titled "altered mattress" or "Mat with paperclip" were played for the jury.

admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[20] Failure to timely object to the erroneous admission of evidence at trial will procedurally foreclose the raising of such error on appeal unless the admission constitutes fundamental error. *Stephenson v. State*, 29 N.E.3d 111, 118 (Ind. 2015). The fundamental error exception to the contemporaneous objection requirement is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006)), *reh'g denied*. To be considered fundamental, the claimed error must make a fair trial impossible. *Id.* (citing *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009), *reh'g denied*). Thus, this exception is available only in "egregious circumstances." *Id.* (citing *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)).

Ind. Evidence Rule 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Ind. Evidence Rule 402 provides in part that irrelevant evidence is not admissible. Ind. Evidence Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Ind. Evidence Rule 404(b) provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Rule 404(b)(2) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Huff did not object to the playing of the second and third video clips and does not point to any objection to McKinney's testimony. To the extent he cites Rule 404(b) on appeal, his objection to the first video clip played to the jury was based on relevance and not Ind. Evidence Rule 404(b). Accordingly, these arguments are waived. *See Halliburton v. State*, 1 N.E.3d 670, 683 (Ind. 2013) (observing that the law is well settled that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal, the defendant made no claim at trial that evidence of the burglary did not fit any of the 404(b) exceptions, nor did he contend at trial that evidence of the burglary

was bad character evidence prohibited by Rule 404(b), and holding that the defendant waived the claim of error for appellate review).

[23]     To the extent Huff points to the first video played for the jury showing the end of the C.A.B. hearing, we note the video does not reveal what offense Huff committed and showed Sergeant McAninch stating only that the "thirty days will stand." State's Exhibit 1. To the extent Huff points to the first video clip in which a loud sound can be heard after he was placed in a holding cell, the record reveals that Officer Hilt testified, without objection, that Huff kicked the door after being placed inside the holding cell. Further, Huff testified he let the door slam to lock Sergeant McAninch in the room because he was upset with the outcome of the C.A.B. hearing, and he walked out "letting the door shut behind me out of spite, because I was upset." Transcript Volume II at 222. With respect to the reference to an ongoing investigation mentioned in the third video clip played for the jury, Huff does not develop an argument that the ongoing investigation related to an offense other than the conviction from which he appeals. As for his contention that certain "testimony regarding uncharged allegations that [he] has been in possession of razor blades on other occasions was admitted," he does not cite to the record. Appellant's Brief at 10. Further, Sergeant McAninch testified on cross-examination and re-cross-examination by Huff regarding razor blades found in his possession. We cannot say that the trial court abused its discretion or committed fundamental error.

[24] The next issue is whether the evidence is sufficient to sustain Huff's conviction. Huff does not assert that he did not possess the razor blade. Rather, he argues that the condition of the metal item found was likely sealed in an envelope for months and had not been altered or affixed to any object which could have rendered it a ready weapon.

[25] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[26] Ind. Code § 35-44.1-3-7 provides:

> A person who knowingly or intentionally while incarcerated in a penal facility possesses a device, equipment, a chemical substance, or other material that:
>
> > (1) is used; or
> >
> > (2) is intended to be used;
>
> in a manner that is readily capable of causing bodily injury commits a Level 5 felony.

[27] In *Abney v. State*, 822 N.E.2d 260, 264 (Ind. Ct. App. 2005), *trans. denied*, the court interpreted a former version of the statute, Ind. Code § 35-44-3-9.5, which

similarly provided: "A person who knowingly or intentionally while incarcerated in a penal facility possesses a device, . . . that: (1) is used; or (2) intended to be used; in a manner that is readily capable of causing bodily injury commits a Class C felony." In addressing the defendant's assertion that the State failed to prove beyond a reasonable doubt that the device was used or intended to be used in a manner readily capable of causing bodily injury, the Court held:

> We agree with Abney that the phrase "intended to be used" is part of the relative clause, modifying the antecedents "in a manner that is readily capable of causing bodily injury" and is not indicative of his level of culpability. *See Hevenor v. State*, 784 N.E.2d 937, 941 (Ind. Ct. App. 2003). Rather, the culpability level for I.C. § 35-44-3-9.5 is clearly defined in the opening sentence as "a person who knowingly or intentionally . . . possesses."

*Abney*, 822 N.E.2d at 265.

[28] The record reveals Sergeant McAninch discovered an envelope that was "sealed pretty tight" with the name of Huff's father on it. Transcript Volume II at 152. The envelope contained letters from a female inmate, a piece of toilet paper, and a razor blade. Sergeant McAninch testified that inmates possessing razors constitutes a "very high security risk, as well as a safety concern for both inmates and staff." *Id.* at 157. McKinney testified that the blades are dangers to others for "any number of reasons" including by coming into contact with staff during the search of an offender's property. *Id.* at 206. When asked to review the photos of the razor blade found in this case and whether it could

cause bodily injury, he answered, "Yes. Absolutely." *Id.* at 212. He also testified: "As soon as it is modified in its, and it's placed in a manner like what the photos are there, they are dangerous weapons, yes." *Id.* at 213. Huff indicated he popped the razors open to remove the blades.

[29] Based upon the record, we conclude that the State presented evidence of probative value from which the jury could have found Huff guilty beyond a reasonable doubt of possessing material capable of causing bodily injury by an inmate as a level 5 felony. *See Abney*, 822 N.E.2d at 265 (concluding that the State presented sufficient evidence to support Abney's conviction and observing that the jail commander described a device as a hardened piece of steel sharpened to a point, elaborated on its usage, and stated it was easily capable of causing bodily injury to guards, other inmates, and the public in general); *see also Phillips v. State*, 875 N.E.2d 480, 482 (Ind. Ct. App. 2007) (citing *Abney* and holding that "'intended to be used' describes the device, not the intent required for a conviction"), *trans. denied*.

[30] For the foregoing reasons, we affirm Huff's convictions.

[31] Affirmed.

Najam, J., and Kirsch, J., concur.