## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 29 2020, 11:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dwight Caprice Cross,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

July 29, 2020

Court of Appeals Case No.
20A-CR-23

Appeal from the Lake Superior Court

The Honorable Samuel L. Cappas, Judge

Trial Court Cause No.
45G04-1603-F2-3

**Brown, Judge.**

[1] Dwight Caprice Cross appeals his convictions for robbery resulting in bodily injury and burglary and raises one issue: whether the trial court abused its discretion in admitting certain evidence. We affirm.

*Facts and Procedural History*

[2] On March 17, 2016, at about 8:15 a.m., Carole Bloom dropped off groceries at the house of her daughter and granddaughter, Jennifer and Jasmine Bloom. As she left to start work at 8:30 a.m., she saw a gray vehicle with two black men she did not recognize as being from the neighborhood driving very slowly in front of the house.

[3] That morning, as she was on a couch in her basement room watching television, Jasmine heard a "really loud banging on the door," the back door was broken open, "someone ripped [her] bedroom door off" its hinge, and a "dark-skinned black guy," a bit taller than her, with short buzzed hair and dark grey clothes, stood in the doorway. Transcript Volume II at 201-203. He shouted something that she did not understand, left, and returned with a second, short, lighter-skinned man with blond twists at the end of his hair. The two men began "going through [her] room" and screamed, "Don't look at me" and "Get down on the ground." *Id.* at 203-204. Jasmine "kept looking at them," and the men hit her on the top of her head, causing a "small contusion, bumps and bruises." *Id.* at 204. She observed the men "kind of have a knife between them," which was "big – like a combat knife" and which the men held and pointed at her while instructing her not to move or look at them. *Id.* at 206-207. They looked through her drawers, closet, clothes, cabinets and dressers,

and they stole her television, Xbox, computer, and iPhone, which they had Jasmine unlock and "turn off . . . all the tracking stuff . . . so that it couldn't be traced." *Id.* at 205.

[4] The lighter-skinned man went upstairs, Jennifer opened her bedroom door and screamed, and he stood "right in front of [her] face" and screamed at her to get down on the floor, which she did, and about "a safe, saying that [she] was on a list of people that had safes." *Id.* at 149-150. He asked her the location of the safe and money, and Jennifer replied they did not have a safe and she did not have money. During this exchange, the man "kind of t[ore] up the room," went through several "purses, looking for money," took her MacBook Pro and her iPhone, and had Jennifer "turn off 'Find my iPhone'" on the phone. *Id.* at 151. At some point, she rose from the ground, he punched her head with his fist, and she fell back down. The darker-skinned man entered the room, the two men spoke in the hallway briefly about cutting the women's throats before returning to Jennifer's bedroom, and one of the men held out the knife and threatened her. The men then left the house, taking a television from the living room.

[5] The following day, Jennifer and Jasmine examined a photo array of suspects at the police station, and Jennifer "wrote, 'Due to my limited vision – I'm blind in my right eye and have limited vision in my left – I cannot identify anyone at this time'" on the photo array and noted that the individual in Photograph No. 5 "looked like [the individual in her bedroom] because he had the same skin

coloring."[1] *Id.* at 173-174. Jasmine identified Cross as the "lighter-skinned, shorter male"[2] and, when shown a second, different photo array, identified the other assailant. *Id.* at 217.

[6] The State charged Cross as amended with three counts of burglary as level 2, 3, and 4 felonies, robbery resulting in bodily injury as a level 3 felony, two counts of criminal confinement as level 3 felonies, two counts of armed robbery as level 3 felonies, and residential entry as a level 6 felony. The State indicated in a response to a discovery order that it had provided Cross with a vehicle search warrant and, in a supplemental discovery response, that it had provided a "Search Warrant Affidavit, Return for Infiniti Vehicle." Appellant's Appendix Volume II at 103.

[7] At Cross's jury trial, the State presented the testimony of Carole, Jennifer, and Jasmine, as well as the testimony of an Indiana State Police forensic analyst who investigated the area around Jennifer and Jasmine's house for security video and who indicated that Cross and the other assailant were involved in a traffic stop together on the same day as the incident. The State also presented a surveillance photograph taken six or seven blocks away bearing a date and time stamp of "3-17-2016 . . . 08:41:47" of a vehicle that matched the description of

---

[1] State's Exhibit 17 is a photo array signed by Jennifer and contains a separate sheet that states, "Position . . . 5. . . . Cross, Dwight Caprice." Exhibits Volume II at 25.

[2] State's Exhibit 25 is a photo array with a circle around a photograph in the third position, which depicts the same individual that appeared in the fifth position of the array signed by Jennifer. On a separate sheet, the exhibit also states, "Position . . . 3 . . . Cross, Dwight Caprice." Exhibits Volume II at 34.

Cross's vehicle. State's Exhibit 116. *See also* State's Exhibit 117 (second photograph). The State also presented photographs of latent fingerprints discovered on the bottom of the interior-side of the door to the house, which appeared "as if somebody had tried to pry the door open or got their hands underneath it to break the door open"; the ten-print card documenting Cross's fingerprints; and the testimony of a law enforcement fingerprint examiner who compared them and testified that he was able to identify Cross as a match. Transcript Volume III at 30.

[8] Hammond Police Detective Daniel Young testified without objection that he was working the day shift at the office on March 17, 2016, when he learned from another detective about a home invasion that happened earlier in the morning, he started to "ask around to see if there's anything [he] [could] do to assist," and that, while he assisted, Cross developed as a person of interest. *Id.* at 67. He testified he learned Cross drove a "silver passenger car," "an Infiniti," and that he spotted a silver Infiniti sometime later in the Merrillville area and discovered during a subsequent traffic stop that Cross's mother was driving the vehicle. *Id.* He indicated he detained and transported the vehicle in preparation for a search warrant and Cross's mother took another officer "to a residence where there was an individual of interest in another case." *Id.* at 70.

[9] During cross-examination, the following exchange occurred between Cross's counsel and Detective Young:

> Q. . . . . What about that that [sic] caught your attention, the home invasion or the silver vehicle?

A. Both.

Q. Okay. Tell us why.

A. I currently had been investigating a burglary where the person of interest was driving a silver vehicle.

Q. How many burglaries?

A. For the silver vehicle, at that time just one.

Q. And you thought that []Cross was involved in that other burglary?

A. Yes. I'd actually developed a probable cause and had filed charged [sic].

Q. You had filed charges?

A. Correct.

Q. For burglary?

A. I believe it was for theft.

Q. That's not a burglary.

A. No. I was investigating a burglary. I presented the case to the prosecutor's office, and they signed off. I believe it was theft. I don't know if it was burglary.

Q. The police reports in this matter indicate that there were multiple home invasions and multiple burglaries –

A. That could be.

Q. – that []Cross could have been involved in.

A. I was investigating one.

Q. Do you know of any others?

A. I do not.

Q. Do you know of any other criminal charges dealing with home invasions where Mr. Cross was charged –

A. There was –

Q. – other than this one?

A. Charged?

Q. Charged.

A. No.

Q. As of March 17, 2016, had []Cross been charged in that theft case?

A. I would have to check the date. If that was the same date where I was trailing that vehicle, then the probable cause affidavit had been signed by the prosecutor's office.

Q. Well, when you say on the date that you were following the vehicle, is that when you had seen that silver vehicle in Merrillville?

A. Correct.

Q. And that was the – later in the day is when []Cross was taken into custody?

A. Correct.

Q. That's when the theft charge was filed?

A. Prior to that.

* * * * *

Q. Okay. Do you know whether or not the date of that theft was before or after March 17, 2016?

A.  It was before.

*Id.* at 72-75.  The prosecutor approached the bench and argued Cross's counsel opened the door to ask about how the witness knew Cross and recognized the vehicle, the court asked Cross's counsel to respond, and Cross's counsel answered: "I asked if he was charged in any other cases, and I said that the police report involving this matter indicated as such.  I mean, if the State wants to go through the door – ."  *Id.* at 76.  The prosecutor indicated: the purpose of the putative inquiry was to show the witness "knows him," "[t]here's no lack of mistaken identity," Cross "was familiar with the burglaries he did," and that they "were similar in nature"; the State was going to ask how Cross became a person of interest and if the witness was aware that this is the vehicle he used; and that the State "wasn't going to go into any facts about [Cross's] uncharged burglaries."  *Id.* at 78, 80.  On redirect-examination, Detective Young was asked how he was familiar with Cross, he responded "[t]hrough an investigation on an unrelated offense" and indicated he was the lead investigator on that unrelated offense and thus familiar with Cross, and the following exchange occurred:

Q.  What type of unrelated offense were you investigating him for?

A.  Burglary.

Q.  And were you aware that []Cross drove a silver Infiniti from that unrelated burglary that you were investigating?

A.  Yes.

Q.  And that was prior to this one?

A.  Correct.

*Id.* at 81.

[10]     The jury found Cross guilty of two counts of burglary as level 3 and 4 felonies, robbery resulting in bodily injury as a level 3 felony, and residential entry as a level 6 felony.  The court merged the convictions for burglary as a level 3 felony and residential entry into the conviction for burglary as a level 4 felony, sentenced Cross to fifteen years for the robbery resulting in bodily injury and eleven years for burglary as a level 4 felony, and ordered the sentences to be served consecutively with the final two years served on community corrections.

### *Discussion*

[11]     The issue is whether the trial court abused its discretion in admitting certain evidence.  The trial court has broad discretion to rule on the admissibility of evidence.  *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016).  A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal.  *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*.  We will not reverse an error in the admission of evidence if the error was harmless.  *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011).  Errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights.  *Id.* at 1059.  In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact-finder.  *Id.*

[12]     Cross argues that the State introduced impermissible evidence of his prior bad acts, and that the jury made the forbidden inference that he probably committed

the charged crimes due to a criminal propensity. He contends the State did not prove the admissibility of the testimony under an express exception to Ind. Evidence Rule 404(b), that he was prejudiced by its admission as it likely led the jury to assume he was a serial burglar, and that it was of minimal probative value. The State maintains that Cross first elicited the evidence regarding the prior investigation on cross-examination and that the minimal testimony could not have prejudiced the jury.

[13] We observe that Cross's defense counsel elicited testimony from Detective Young that he "had been investigating a burglary" in which the person of interest was driving a silver vehicle, asked for additional explanation after Detective Young indicated that "[b]oth" the home invasion and the silver vehicle caught his attention, and elicited Detective Young's statement that he "was investigating one" of multiple home invasions and burglaries in which Cross could have been involved. Transcript Volume III at 72-73. The invited error doctrine forbids a party to take advantage of an error that the party "commits, invites, or which is the natural consequence of [the party's] own neglect or misconduct," *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018) (quoting *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005)), given some evidence that the error resulted from an "appellant's affirmative actions as part of a deliberate, 'well-informed' trial strategy." *Batchelor v. State*, 119 N.E.3d 550, 558 (Ind. 2019) (quoting *Brewington v. State*, 7 N.E.3d 946, 954 (Ind. 2014), *reh'g denied*, *cert. denied*, 574 U.S. 1077, 135 S. Ct. 970 (2015)). In light of the record, we conclude that Cross invited any error with respect to the challenged testimony.

[14] Further, we find that any error with respect to allowing the State to ask questions on redirect and Detective Young's responses was harmless. Upon being questioned by Cross's defense counsel, Detective Young testified he was investigating a burglary. The implication of Detective Young's statement is that he had believed Cross to be involved in an unrelated burglary he was investigating, and we conclude that his subsequent statements on redirect examination did not impact Cross's substantial rights. *See Pritchard v. State*, 810 N.E.2d 758, 761 (Ind. Ct. App. 2004) (holding that, even if it could be concluded that it was error for the trial court to admit certain testimony, the error would have been harmless and the defendant was not prejudiced by the admission of the testimony). Any error is also harmless given the substantial independent evidence set forth above and in the record. *See Turner*, 953 N.E.2d at 1059 ("The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction.") (citing *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009)); *Cole v. State*, 970 N.E.2d 779, 784 (Ind. Ct. App. 2012) (holding that an error in the admission of evidence does not justify reversal if the evidence is cumulative of other evidence presented at trial).

[15] For the foregoing reasons, we affirm Cross's convictions.

[16] Affirmed.

Najam, J., and Kirsch, J., concur.